Good morning. May it please the court. Craig Stewart for Appellant Unocal Corporation. By agreement with counsel for the DRC, I intend to take seven minutes of our allotted time. DRC's counsel will take seven minutes and we hope to reserve one minute for rebuttal. FG Hemisphere's argument in this case is that the DRC's immunity should be lost because of the supposed unfairness of the manner in which Unocal and its subsidiaries are structured and operate. I intend to focus in my portion of the argument on the property in the U.S. prong, what the district court called the second phase. We've argued in our briefs that the whole notion of embarking on the alter ego analysis is contrary to the structure and text of the FSIA. I would like to focus on something that I think is even more fundamental that cuts through a lot of the arguments here, which is that ODS possesses the asset at issue here and has the ability to comply with any order that might be entered against it, assigning its obligation to make payments to the DRC, assigning that obligation to someone else. The ODS holds the interest in the oil concession. It receives the payments that come when that oil is sold. It makes the payments to the DRC. There's no dispute here that it has always done that. It has the continuing capability of doing that. And so there can be no dispute that if there were a valid order assigning that right to FG Hemisphere, that ODS would be able to respond to that. So the issue here is not whether ODS has the ability to satisfy its obligations or its liabilities. It has that ability. The issue is simply that ODS is incorporated in Bermuda. So FG Hemisphere is not complaining about ODS's assets, simply where ODS is incorporated. Now, the district court found that that was a basis for finding that the property is located in the U.S. because the district court perceived it to be unfair to create offshore subsidiaries for what the district court viewed as the purpose of avoiding payment to creditors. Well, the district court was really focusing on the second prong of whether they could really get to this particular asset, correct? Correct. And let me focus on that point. I mean, in California, you've got two prongs. Correct. Exactly. And I think They were focusing on the second prong, which was that this would work for odd or injustice. And I think it's very telling, Your Honor, if you look at the red brief of FG Hemisphere, when you get to that question about fraud or injustice, you don't get to it until you get to page 45 of their brief. And there's a page and a half argument there. Up until that point, they're all talking about the corporate formalities and how those weren't supposedly properly observed. I think they're dead wrong on that point. But the one that I think really cuts through it is the fraud or inequity point and the causation point. And what they argue on pages 45 and 46 of their brief is that this is inequitable because they have no ability to enforce this judgment, collect on this judgment, any place. But, and this I think is very important, what do they cite for that? They cite a single email in which ODS informed counsel for FG that ODS has no assets in Bermuda. I was quite so impressed with her brief as I was with the idea that the district court said in really thinking about both of these things, that if this were allowed to stand, then UNICAL would have succeeded in constructing a shell game that effectively insulated the payments from the enforcement of a judgment creditor. And that was the district court who was suggesting that. I think the district court was reciting the arguments of the parties. Well, it might have been. But I'm just suggesting, I mean, the district court was then applying, if I understand it, the alter ego rule in California to this particular situation, correct? What the district court found is that it was unfair to create this offshore subsidiary. And the plaintiffs argue, FG argues, and that unfairness is, as your Honor has just described, that there was a supposed shell game. Well, my worry is that once I get past the first argument as to whether FISA prohibits this application, of the alter ego theory, it seems to me then at that point I have to find that the district court clearly erred in finding that ODS was the alter ego of UNICAL. And at that point I have to give the district court some deference. Do you agree? No, I don't agree with that. Here's why, your Honor. We have California law. We apply. And if it's not contra to FSIA, then I'm looking at what did they look at for the facts in the application of the California law. And I looked at what California did, or what the district court did in finding facts. I think that's clearly erroneous standard. If we look at the district court's order on the second phase, there are no factual findings in that order. If you look at ER 47, this is page 15 of the court's order, there's a legal conclusion. There are no factual findings. There is no factual finding that ODS is unable to respond to a valid order entered against it to redirect the payments to FT Hemisphere or any other party that might be entitled to it rather than the DRC. And if there were such a finding, it would absolutely be clearly erroneous. There is no evidence on the record to support that. What the plaintiffs point to is this single email, as I say. Well, I guess I thought you were arguing just from a legal standpoint that assuming that we have to apply California alter ego law, which I'm skeptical of, you have a footnote in your brief that seemed persuasive to me, but we're bound by Peterson on that. Right. I thought you were just arguing that as a legal matter, California alter ego, the California alter ego doctrine does not extend to the situation in which the plaintiff had no dealings with the, right? Yes, Your Honor, absolutely. And if that's true, then it just seems to me, don't we just stop right there? I think you, absolutely, I think the court can just stop right there. The plaintiffs cite to the Messler case and say, well, it operates in favor of third persons, as though they're encompassed within that term, third persons. But if you read Messler and you read all the other alter ego cases, they're all talking about the unfairness to the party who dealt directly with the entity that has supposedly abused the corporate forum. And that absolutely is not the case here. The DRC is the party with whom ODS dealt. And the DRC is not claiming any alter ego, nor could it, because those payments have been made, as they should be, and there's no claim that there's been any abuse of the corporate forum. So how is it that FG Hemisphere has even greater rights than the entity with which ODS has had its dealings? Well, I mean, from my standpoint, I just don't see how we as a federal court, trying to guess as to what California law is. If we have no authority whatsoever, that would, it seems to me to be a pretty drastic extension of the alter ego doctrine to this new set of facts that no California case, apparently, I want to hear from counsel for the other side, has ever done. It seems to me that wouldn't be a very wise move on our part. Absolutely. And for at least two reasons. One is, this is a matter of California law itself. Alter ego doctrine, as the cases we've cited in our briefs, is an extreme remedy to be sparingly used. That's the Sonora Diamond case. And then you layer on top of that the FSIA framework, which says that exceptions to immunity from execution are very narrow and extremely restrictive. And so you take a very narrow, restrictive state law doctrine, take it in the context of an exception that is to be narrowly construed, and you just have a complete mismatch. So absolutely, we feel that we shouldn't even go down the road of applying the alter ego doctrine here. Do you get into any difficulty when you know, and anybody who reads this record knows, what the judge was doing and why the judge was doing it? This was a situation where somebody, in a clever way, decided, we're not going to pay, you're not going to recover, and here's the way we're going to do it. And the judge looked at the situation and said, I'm going to put a pin in the balloon. It's not going to work. And that's all that happened. There's nothing secret or surprising or unknown about the facts in this case. And the procedures used, is there? I think what is, what does blow a hole in that, is that the district court did not go through the analysis that's required to find, assuming we're going to go down the road of alter ego at all, to find that alter ego could be applied here. What we have on page 15 of the order is a bare legal conclusion, unsupported by the types of facts that would need to be found. So the first point is, alter ego is improper under state law, under the FSIA. But the second point is, if we were going to go down that road, there is no unfairness, Your Honor, of the kind that you're just describing. Because ODS has this asset. What they're seeking is to attach a payment stream, a right to payment, that derives from an interest in the oil concession. ODS has that interest. And ODS has always made those payments. ODS has the ability now to make those payments to FG if there were a valid order, compelling it to do so. That's just sort of indisputable. So I think I want to just be clear that the underlying premise here of some unfairness, I think, is just completely unfounded. And so I hope that there's not a sense that that taints the rest of the legal analysis that we've been talking about. You have used a portion of your other counsel's time. So I'll maybe stop you and let her have a chance. Thank you, Your Honor. Thank you. Thank you, Your Honor. My name is Tarly on behalf of the Democratic Republic of Congo. I'm tempted, very tempted, to weigh into the equities conversation. But I'd like to dispense of it as quickly as possible because I want to move the Court's case before you get to this equities question. But very briefly on the equities point, we are talking about a situation here where the party seeking the equitable remedy and one side of the balance that an alter ego doctrine analysis would require you to weigh, has purchased into a high-risk situation where there's a high likelihood of a difficulty of reaching assets. That, I think, is a different weight to the equity than what I'm hearing expressed in the questions that are coming from the Court, and I wanted to clarify. Lastly, I think it's also quite important that there is a disconnect here in the alter ego analysis between the alleged wrongdoing of failing to observe corporate formalities and the proposed remedy of harm that would divert the assets from the DRC, who, as Mr. Stewart noted, isn't responsible for the wrongdoing that the equitable analysis is intended to remedy. What I would like to ---- I was shut down in Peterson because I was a dissent, but in Peterson we had the opportunity of someone who didn't even call for sovereign immunity to be argued, and the judge brought it up and they nonetheless allowed it, and then they said the foreign state need not even be the one requesting the whole thing, so I'm a little worried about where you're going there. I recognize your concern. I mean, I was going to say, well, if the foreign state wasn't even in the case and they didn't even come, I don't know why we're talking about foreign immunity, but I had two good judges on my circuit who said, calm, Smith, you're in the dissent, and I wrote about it, so I'm a little worried about where you're going there. I understand that concern, Your Honor. I think I can resolve it by moving you to the plain language of the statute. Okay. Y'all will have noticed that an awful lot of the opinions in FISA that deny the grant of an exception and that find the property to be immune begin with this phrase, the plain language of the statute. You will also notice, I'm sure, that this district court's opinion does neither of those two things. It doesn't end up ruling that there's an immunity, and it doesn't start with the plain language of the statute. In fact, the analysis that the district court engaged in here begins with a very different phrase that I think it's very important that we focus on it. Page 8 of the May 2012 opinion, what the court says is that for the purposes of the FISA, debts are located wherever the debtor may judicially be found, and that's new. This creates a remarkably broad new rule that, as Judge Wofford noted, no other court has put forward before. No analysis has taken place in any court to find that property of the U.S., that prong, can be established by having its location established through an alter ego analysis on a third-party garnishee. The reason courts haven't done that is back to the overarching approach of the FISA. The courts that have analyzed it have rejected it because the language and approach of a rule like that that the district court would suggest subverts both the restrictive intent of the FISA and places a potentially significant burden on sovereigns who would be deprived of the capacity to control the outcome of whether or not their property would be immune. Well, but you would agree, wouldn't you, that Philippine export and foreign loan suggests that the location of a right of payment, at least for the purpose of applying the section in a suit against a foreign state, is the location of the debtor? I think as a general rule, yes, Your Honor. But the location of the debtor issue has been greatly expanded in terms of where that analysis would now arrive in the burden of proof that a FISA evaluation requires. So, and this is important, because of where and when in that analysis the burden shifts to the foreign state, imagine what happens if the rule that lets alter ego analysis or requires, as this court would have it, alter ego analysis to determine whether you even get to the list of potential exceptions or not. If you advance that moment in the analysis to the point where the court has to decide, has the plaintiff, the claimant, made its prima facie showing that an exception is going to apply, in this case the court is actually ruling that at that moment, as long as they invoke alter ego and say that there might be a third-party garnishes subsidiary somewhere that they could attach, then the burden will now shift to the defendant to prove that exception. And imagine how that works. Discovery between a corporate entity and its subsidiaries that the foreign sovereign may not have control over, but would have the burden of proving, really badly subverts the restrictive intent of the FISA. Thank you very much. You've exceeded your time, so we'll give the appellee the chance. Did you have a question? No.  May it please the Court. My name is Michelle Goodman from Sidley, Austin, representing appellee FG Hemisphere Associates. If I can, I'd like to address the issues in the manner in which they came up. The first point that Unical's counsel I'm going to have a hard time listening to anything other than the specific question on California alter ego law that I raised. Yes. Can you tell me, are they wrong when they say that, hey, FG fails to cite a single case in which California courts applied alter ego principles to somebody who had no dealings with the party whose corporate veil was supposed to be pierced? They are wrong. There are no cases that say alter ego in California is only applicable to someone who has dealings with the entity involved. I don't even know what dealings is supposed to mean. It's certainly not Alter ego doesn't require a debtor-predator relationship. It doesn't require a contractual relationship. And to the extent dealings means you have some sort of history with someone, that's met here. Because the You are wronged by the entity that now supposedly has inadequate assets to satisfy the judgment you've obtained. I think even in this case it goes even farther than that. My client and entities like my client were the specific reason why Unical decided to manipulate its corporate form. Yeah, but so what? You have no dealings with them whatsoever. They haven't done anything to you, it seems to me, that's harmed you. Well, two points there. One, as it applies to California law of alter ego, the courts have repeatedly said it is a flexible doctrine and it is used to accomplish equity. So there are no cases that restrict it to a situation where you are specifically wronged. Okay. But are there cases that extend it to this context? Yes. Well, first of all, to the extent that I'm sorry, my second point was to the extent that what we're talking about is a specific action that was wronged my client. Part of the reason why we don't have any specific cases that apply it in this context is that this is an enforcement action. The few cases that the plaintiffs have cited, that Unical has cited, are cases that necessarily were just underlying liability. And so they pull out language that's merely dicta that says, you know, it relates to the underlying claim, because that's what was at issue here. There is absolutely no requirement of any sort of contractual or other relationship or specific harm. That is inherent in the position where we are in terms of enforcing. Absent that, I just don't see how the injustice prong of the alter ego analysis is going to be met. That's why I think all of the cases probably arise in the context where the plaintiff had some dealings, however you want to define that, but they were tortiously injured or had some contractual claim with an entity that they're now looking to that, hey, oh, conveniently, all of the assets are somewhere else. But at least that they've been harmed in some fashion by the entity whose corporate veil they want to pierce. Well, here, my client has been harmed by the entity whose corporate veil has been pierced. And I'd like to get to the point that they were saying, they were making about how we could just go to Bermuda and attach the assets of ODS in Bermuda. That argument does not answer this question, because the fundamental problem here is that UNICAL has manipulated its corporate form to allow, to keep control over this asset and create a shell corporation in Bermuda. It doesn't want to be embroiled in the collection efforts of some other entity that it just is a mere contractual party with. I don't see anything bizarre or unjust about that. There's nothing unjust about creating a subsidiary corporation for that purpose if it's a real corporation. Here, it is not a real corporation. And what leads to the inequity is a situation where even if we tried to collect against the ODS assets in Bermuda, because UNICAL retains control, all they need to do is create a new shell somewhere else in the world and just transfer the assets there. And there is nothing speculative or hypothetical about that, because they already did it. Well, my worry, I appreciate very much my colleague's question. My worry is I was going to give you a clearly erroneous standard review for what the district court did, but then reading what the district court did, I'm trying to figure out what facts it found. Do you know what facts it found in regard to this? I do, Your Honor. Where are they? If you look at, I have the record site. It's page 47 of UNICAL's record. I can give you. Just take the district court's decision, I guess, the border finding. I mean, I went to page 15, which is exactly where counsel took me, and I'm trying to figure out whether that is really a finding of fact to which I owe deference or not. Yes, Your Honor. On page 15, after detailing all of the parties' arguments and evidence with citation to the briefs where this evidence is located, she made the following findings of fact. The court finds that FG has met its burden of production by offering evidence that the property at issue is in the United States. She says FG has demonstrated that ODS and UNICAL have a unity of interest of ownership and that FG would suffer fraud and inequity if the purported separateness of ODS and UNICAL is not disregarded. The evidence further shows that UNICAL is attempting to avoid paying debt creditors and payment to the DRC by setting up wholly owned subsidiaries in foreign countries. The finding that UNICAL and ODS have a unity of interest of ownership and the finding that FG would suffer fraud and inequity are findings of fact. They are not questions of law. The question of law is what is the applicable standard. And she clearly applied the applicable standard and made the appropriate findings of fact. And this Court is required to assume that the district court made all of the underlying specific findings of fact necessary to support that judgment and to affirm it unless it is clearly erroneous. And it is not clearly erroneous because there is ample evidence in the record to support both of those factual findings. In the record upon which the district court relied, I mean, I'm looking at all of the facts in the opinion. You're saying they're there other than this particular reference? Correct, Your Honor. By describing all of the factual arguments and giving citations to all of the briefs, both ours and UNICAL's, the district court made very clear that she reviewed the evidence, she understood the arguments, and she was making findings of fact based on that evidence and those arguments. What's your best case, California case, for the most analogous factual to our situation where California court applied alter ego principles? I think the best analysis is there are cases that, well, you have to use two cases. One is the Questar case in which the court said, and if I can have a moment. What were the facts? Just remind me what were the facts of that case. Well, in that case, it involved a bank account. But what the court said was essentially that a California court has jurisdiction to assign or attach the assets of a foreign government if the third-party debtor is within the California court's jurisdiction. And then if you look at the Mathis case, the California court says. You said Mathis. Mathis, M-A-T-H-E-S. California clearly says that the question of personal jurisdiction and whether it has jurisdiction over a particular entity, you can apply alter ego, and in fact did apply alter ego to find that it had personal jurisdiction over the foreign subsidiary. It was an Indonesian subsidiary of a California-based parent. So if the court has jurisdiction. I assume in that case had some dealings, again, broadly defined with the subsidiary, right? That's correct because that was an underlying action. It was not an enforcement action. I mean, that is fundamentally the nature of an enforcement action. If you are enforcing a prior judgment, you are not going to have dealings. The person is a third party. And California courts have said alter ego is flexible. It is to be used to accomplish justice. It is to be used to assist third parties. There is no requirement. And they have cited no case saying that the California court would limit in this way. It seems to me the burden is on you, though, as an initial matter, to make out a prima facie case to show that California courts would extend it. And I think we have, Your Honor. I think we have said that under California law, California courts will enforce attachment and assignment as long against a nonresident third party as long as they have jurisdiction over that third party. I mean, I'll look at the Questar case. I have not read that one yet. But the Mathis case, there are a couple of others like it. It just seemed to me not to get they don't come far enough. But maybe the Questar case is the one for you. And I also, there were a couple of other cases in which the DRC cited. I believe one was the global money management and one was legion of, hang on a second, legion for survival of freedom. And those cases all suggest that a court may compel acts by nonresident third persons over which it has jurisdiction. Now, those cases say that you cannot reach out in a sort of in rem jurisdiction to affect physical property located outside the jurisdiction. But if you have jurisdiction over the entity, and if we are talking about intangible property, which we are, the location of the property depends on who is the debtor. And so you can attach and assign the property of someone over whom you have personal jurisdiction. Can I ask you this? I don't know if it's in the record necessarily. But is the problem for your client that Bermuda law does not allow an attachment order of the kind that you want? The problem for my client is that UNICAL has been setting up shell subsidiaries. Can you just focus on my question now? Because I just want to know, does Bermuda law, is that because you just want an order attaching this future stream of money. It doesn't really even matter where the money is. So if you go to the place where ODS is, do the courts there just not allow that kind of attachment order? Is that the problem? That's why you need to come here? I do not know the answer to the question of whether Bermuda courts would or would not allow it. What I do know. How can there be any injustice to you if you don't know the answer to that question? Because what I do know is that UNICAL has kept control over this property. That UNICAL has previously manipulated its corporate form to move it from one shell to the other. And has done it specifically to avoid judgments such as this. So go to Bermuda, where it is, and get the same attachment order? Well, for example, I will give you an example. This is in the record. When prior judgment creditors got settled with UNICAL to attach the specific assets, UNICAL created a subsidiary in Bermuda called UNICAL Congo. They moved the convention to that subsidiary. Then when another creditor came along and found out about the existence of that subsidiary, three months later after creating UNICAL Congo, they created a new subsidiary, ODS. Then they amended the convention in what's called AVENANT or Amendment 7, to make clear with the DRC that they may transfer this asset to any affiliate at any time and that the convention and all the rights and benefits automatically transfer with it. Let me state this proposition. Tell me if you agree. There is no injustice whatsoever to your client if Bermuda law allows you to get the kind of attachment order you seek here. I think there is an injustice to my client. You can go for all the money in Bermuda. How is there an injustice?  They have been told there are no assets by ODS. You need to go in California. Now we're going to go in Bermuda and they're going to tell us, I'm sorry, we moved it to Timbuktu. That's not a physical asset you're trying to seize. You want a future stream of money you can attach. Correct. And the question, the appropriate question is only who is the debtor and where is that debtor located? Who is the true debtor? And apropos of that, I mean, we haven't even discussed the issues under the FSIA. But it is very clear that the location of intangible property is where the debtor is located. And if the debtor is located in the United States, the court has the power to attach this property. And we are, there is no exhaustion requirement. There is no requirement that we show that we can't get it anywhere else in the world. The only question is whether under the Foreign Sovereign Immunities Act they have waived their immunity. And they have. One quick point I'd like to make, this is not about waiver of immunity. The DRC has waived its immunity. They waived it a long time ago. There are three requirements under 1610A for attachment immunity. The first is that one of the seven enumerated exceptions apply. And one of those is waiver, but the one that we fall under is subsection 6 where you're moving to, you know, enforce an arbitral award. The second requirement is also waiver-like in that it ensures that the foreign state has done something purposeful to put this property at issue. And that is a requirement that the foreign state itself use it for commercial activity in the United States. That has been met here. The only thing we are talking about when it comes to alter ego is simply the first question, which is where is the property located? And that only has to do with the jurisdiction of the court and the territorial reach of the court. And here, applying standard alter ego, which is clearly applicable under California law, the court found that the property is located in California because the true debtor is Unicow. And I see my time is almost up. Thank you. Your time is up. Thank you, Your Honor. All right. I think we gave you plenty of time and your counsel plenty of time. I guess I'll give you 30 seconds. You can split it however you want because I held her to the time. She didn't go over. You went over quite a bit with your counsel because you took quite a bit of her time. I would just like to say, Your Honor, Questor, F.G. Hemisphere said in their brief that it's in no way similar to the circumstances here. There was no alter ego claim there at all. In our brief, we cite the Fleming case and the Messler case for the point that there have to have been dealings directly with a corporation. And I think perhaps most telling of all is the answer that she gave, which I think confirms the point I was making, that they don't know that they couldn't do this in Bermuda. And so for all the reasons we've given, plus that reason, there is no fraud or inequity here. If we even get to that point and we agree with Judge Wattford, we should. Thank you. Well, I don't know that Judge Wattford is agreeing with you. He is at least questioning and looks pretty much like he would agree with you. I think I need a quick moment to do that. We'll take a break at this point.
judges: Farris, Smith, Watford